[No. B209075. Second Dist., Div. Four. Oct. 2, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ARLESTER CARLYLE GORDON II, Defendant and Appellant.

## Counsel

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**EPSTEIN, P. J.**—Arlester Carlyle Gordon II appeals his conviction of one count of being a felon in possession of a firearm, in violation of Penal Code section 12021, subdivision (a)(1).[1] He claims he was not properly advised of the rights he was waiving by agreeing to a court trial on that charge. We conclude he knowingly and voluntarily waived his right to jury trial on the gun possession charge. Appellant also claims that under principles of collateral estoppel, he could not be prosecuted for possession of a firearm after the jury acquitted him of all charges related to the incident where he allegedly possessed the gun, since the contested issue of identity crucial to guilt in both proceedings was necessarily decided in his favor in the jury trial. We agree with this contention and reverse the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

The underlying facts in this case were presented during the jury trial on charges of felony murder, attempted murder, and kidnapping. The jury found appellant not guilty on these charges. Relying on the evidence presented during the jury trial, the court then tried the severed count of felon in possession of a firearm, and found appellant guilty. Our factual summary reflects the conflicting testimony which gave rise to these different determinations.

In the early morning hours of May 2, 2007, Tonia Taylor was talking, drinking and playing cards with several other people in the front bedroom of Shelby Williams's house, which was the rear house at 4234 Third Avenue, a residence Taylor described as a crack house. Melvin James was one of the persons present at the time. About 5:00 a.m., three men entered the house. According to Taylor, one was short, one was medium height, and one was tall. The short man asked James if he had anything to sell, but James

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

indicated he was not selling drugs at that time. During that conversation, the tall man turned around, reached over Taylor's head, and pointed a gun at James's head. The tall man told James to give up the money, James tried to get the gun from him, and the two men struggled. Taylor ran to the kitchen during the struggle and pulled a mattress over her head. She heard two gunshots, saw James on the ground, and ran out of the house. She did not see the three intruders leave the house. Melvin James died as a result of two gunshot wounds.

Tonia Taylor told police the shooter was a Black male, six feet two inches to six feet three inches in height, light skinned, wearing a black leather jacket and a black beanie. She described the short person as five feet two inches tall, 120 to 130 pounds, with a dark complexion, and wearing a leather jacket. She described the third intruder as a Black male, with light skin with curly hair. Taylor identified Samuel Riggs from a photo six-pack as the short intruder "who was doing all the talking." She identified Kevin Cheval at the preliminary hearing as the medium-sized man. She selected appellant's photograph from a six-pack as looking like the shooter; she wrote on the back of his photograph, "Kind of look like him." At trial, she did not think appellant looked like the person in that photograph.

Shelby Williams had been asleep in the house when he was awakened by a "loud pop" from the other side of a curtain. He sat up, and saw two men coming through the curtain. One of the men asked Williams for the location of the backdoor. Williams pointed it out, and the men ran out the door. Police showed Williams a photo six-pack. He selected appellant's photograph as someone he had possibly seen before in the neighborhood; he selected a different photograph as looking familiar because of the eyes. When he saw appellant at the preliminary hearing, Williams identified him as the person who asked about the backdoor. He explained he only saw the person for two seconds, and he made the identification based on appellant's eyes and ears.

Rickey Marks was sleeping in his car, parked across the street from Shelby Williams's house when he was awakened by the sound of car doors slamming. He saw three men get out of a white Ford Taurus and walk toward the rear house. They came out a little while later, got into the car, and left. He recognized the driver as Kevin Cheval, and the "little dude" with him as Samuel Riggs. He identified appellant in a photo six-pack, but that identification was "based on something someone told me."

Kevin Cheval testified that on the date of the incident, he had stopped at Riggs's house because he was drunk and wanted to get some sleep before driving home. Riggs asked Cheval to take him to get some crack cocaine. Cheval agreed, and as he and Riggs walked toward Cheval's white Taurus,

appellant joined them. They stopped at one location to buy drugs, but were directed to go to Williams's house. According to Cheval, he parked near the address, and Riggs and appellant walked down the driveway to Williams's house, which was the rear house. Cheval stayed in the car for a few minutes, then got out and walked toward the house to find out what was taking so long. He went to the backdoor and went through to an inner doorway with a curtain in front of it. He heard noise, arguing, and screaming. And then he heard gunshots coming from the other side of the curtain.

Cheval ran out the backdoor, then back up the driveway. Appellant came from behind, grabbed him by the collar, and pulled and dragged Cheval to his car. Appellant had a gun in his hand, and when Cheval tried to resist, appellant hit him in the back of the head with the gun. All three men got into the car, and appellant told Cheval, "Get out of here. Drive." Cheval drove back to Riggs's house, Riggs and appellant got out, and Cheval drove away. Cheval was arrested 12 days later. He was later considered a victim of kidnapping, as charged in count 4.

Riggs testified that Cheval drove him to get some crack cocaine. He went into the house at the rear of 4234 Third Avenue. He was high at the time and did not remember if Cheval went in with him. He did not remember appellant going with them, and did not remember if he saw a fight or a struggle, or heard a demand for money. In a recorded interview with police, Riggs identified appellant's photograph and told police appellant went to the house with him, and Cheval drove them. Appellant pointed the gun at James, James came at appellant, the two started wrestling, and then appellant's gun went off. Riggs told police he did not know why appellant pulled out a gun, but, after being asked several times, he said he thought appellant did it to get some money.

Appellant was arrested and charged with the murder of Melvin James during the commission of an attempted robbery (count 1; § 187, subd. (a)), attempted robbery (count 2; §§ 211, 664), the kidnapping of Kevin Cheval (count 4; § 207, subd. (a)), and possession of a firearm by a felon (count 5; § 12021, subd. (a)(1)). It was alleged that appellant personally used a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (d), and that he had suffered a prior felony conviction within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (a) through (i).

At the start of trial, appellant's counsel moved to sever trial on the prior conviction allegations and the felon-in-possession charge from the other counts. The court granted the motion and appellant agreed to waive jury trial on the severed count and allegations. The jury found appellant not guilty on

counts 1, 2 and 4. The court then tried appellant on count 5, the severed charge, and found him guilty. This is a timely appeal from the judgment of conviction.

## DISCUSSION

### I

■ Appellant claims he was not properly advised that if he waived his right to jury trial on the firearm possession charge, a court trial would occur on that charge even if the jury acquitted him of the other charges. "[A] defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 [109 Cal.Rptr.2d 836, 27 P.3d 726].) That standard is satisfied here.

With appellant present in open court, appellant's counsel moved to bifurcate trial on the prior conviction allegations, and to sever trial on the felon in possession of a firearm count from trial of the other charges. The prosecutor indicated she was not arguing against bifurcation of the priors, but did object to "bifurcation of the charge." The court said, "Let's do one thing at a time." It then proceeded to address bifurcation of the priors, asking appellant directly whether he understood what was requested: "Do you understand what we're doing here? Your lawyer doesn't want that jury to know that you have all these prior convictions." Appellant said he understood that. The court reminded appellant he was entitled to a jury trial on the priors, but he could make a decision about whether to have a court trial on the priors "because they don't have any meaning unless you are convicted." Appellant said, "Okay." The court continued, "So your lawyer is saying . . . I don't want you to be tried on those priors during the trial with respect to the murder charges and the robbery charge." Appellant was asked if he agreed with that, and he replied, "Of course, yes." The court then ordered that "the priors trial will proceed after the guilt phase of the underlying charges."

The court then turned to the motion to sever trial on the section 12021, subdivision (a)(1) charge of felon in possession of a firearm. Defense counsel acknowledged that the count was permissibly joined, but urged severance: "The People amended the complaint right before the prelim to add the ex con with the gun. He can't get anymore time for an ex con with a gun charge. It's a status crime. And the only reason that it's been filed is to tell the jury that he has priors. Here is what I would suggest that we do. And that is to

sever—now, I don't remember if it's count 4 or count 5 because there was a skipped count in there somewhere but sever the ex con with a gun charge. And we will waive jury on that count. Therefore, if the jury acquits, they can leave, and the court can decide that charge. If the jury convicts, then they can leave, and the court will decide that charge."

The prosecutor objected to waiver of jury on the felon-in-possession charge, and disagreed with defense counsel's characterization of it as a mere status offense. The court noted that the three-year gun possession offense was essentially meaningless since appellant would face life without the possibility of parole if convicted of the murder charge. The prosecutor again disagreed, arguing that the charge would not be meaningless if appellant was not convicted, or if the jury came back with lesser offenses. She urged the court to sanitize the felony conviction, but not to sever the count.

After further argument, the court granted the motion to sever count 5, "[a]nd then you could make a decision as to whether you want the court to try it or jury to try it. And let me know." At that point, the prosecutor agreed to a court trial on count 5. The prosecutor then took appellant's waiver: "In case BA322130, you have the right to have a jury trial as to the prior convictions that are alleged pursuant to Penal Code section 1170.12 (a) through (d) and Penal Code section 667 (a) through (i). And also as to the charge [of] a felon with a firearm. Do you understand that?" Appellant said yes. The prosecutor explained the rights encompassed in a jury trial, which appellant said he understood. She continued, "Now, at this time, my understanding is you would like to waive your right to a jury trial. And if the court—if the jury comes back guilty as to the charge, you want the court to hear your priors trial. *And you also want the court to hear your trial regarding felon—ex felon with a gun.*" (Italics added.) Asked if he waived his right to a jury trial as to those allegations and the charge of felon in possession, appellant said he did.

Appellant was clearly informed of his right to jury trial on the priors, and on the charge of ex-felon in possession. He was told the court trial on the priors would occur "if the jury comes back guilty as to the charge . . . ." But nothing said by the court or by counsel indicated that trial on the felon-in-possession charge was similarly conditioned on the jury returning a guilty verdict on the other charges. Nor did appellant ask any questions or express any uncertainty with regard to this waiver of jury on the severed count. Considered as a whole, the explanation to appellant and his subsequent waiver of jury on count 5 reflect appellant's understanding of the nature of the right he was abandoning, the consequences of that decision, and his free and deliberate choice to do so.

## II

Appellant claims collateral estoppel barred the court from convicting him of being a felon in possession of a firearm after the jury acquitted him on the charges during which the firearm possession allegedly occurred. Because the only defense to those charges was misidentification, appellant argues the issue of identity was fully and finally resolved in his favor and could not be relitigated in his court trial on the firearm possession charge.

■ As the Supreme Court explained in *Ashe v. Swenson* (1970) 397 U.S. 436, 443 [24 L.E.2d 469, 90 S.Ct. 1189], "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." This principle applies not just in civil litigation, but also in criminal law. (*Ibid.*) In criminal cases, the doctrine of collateral estoppel is not to be applied with hypertechnicality, "but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " (*Id.* at p. 444.)

### A

Before we examine the basis for appellant's acquittal, we dispense with respondent's claim that collateral estoppel does not apply in this case because appellant's trial "was a single proceeding bifurcated only as to the trier of fact on count 5 and his prior convictions." Collateral estoppel is traditionally applied to successive prosecutions, and there is some question whether collateral estoppel applies to further proceedings in the same litigation. (See *People v. Barragan* (2004) 32 Cal.4th 236, 253 [9 Cal.Rptr.3d 76, 83 P.3d 480]; *People v. Cooper* (2007) 149 Cal.App.4th 500, 519 [57 Cal.Rptr.3d 389].)

We need not resolve that question here. Appellant's motion asked the court "for an order severing for trial the charge of ex-felon with a gun from the trial of the other counts." He argued that joinder of the charges "has resulted in consolidation of charges in which strong evidence of a prior felony conviction as the predicate status crime alleged (ex-felon with a gun) is inflammatory and is being used to bolster a weak case on another crime." The trial court expressly granted appellant's motion to sever count 5, felon in possession of a firearm, from the remaining counts.

After the jury returned its verdict acquitting appellant of the charges of murder, attempted murder and kidnapping, the court set trial on the remaining count for possession of a firearm. The court addressed appellant: "Mr. Gordon, you understand that you've waived jury and I'm going to hear argument as to the remaining count against you." Appellant said, "Yes." The court continued: "And I want you to understand I'm not bound by the jury's verdict." Appellant replied, "I know." The court then said, "This is a separate trial, okay. Do you understand that?" Appellant replied, "I understand that." Trial on count 5 was not a mere continuation of the jury trial which had resulted in acquittal. It was a separate, subsequent trial subject to application of collateral estoppel as to issues which were fully and finally decided at the previous jury trial.

## B

We turn to an examination of the issues necessarily decided by the jury in the first proceeding. Appellant was charged in count 1 with the murder of Melvin James, while engaged in the crime of attempted robbery, and in count 2 with attempted robbery of James. As to these counts it was alleged that appellant personally and intentionally discharged a firearm causing death, and that he personally used a firearm. (§ 12022.53, subds. (b), (c), (d).) Count 4 charged appellant with the kidnapping of Kevin Cheval, with an allegation of personal use of a firearm. One prior felony conviction was alleged.

The prosecutor spelled out the disputed issues in his summation: "Now, I want to discuss the evidence in this case. And before I do that, I want to go into, what is not in dispute in this case? Well, one, that Melvin James, aka Sunshine, was murdered by one of three men who came into that front room on May 2nd, 2007 at around 5:00 a.m. That is not in dispute. Two, that two of the men have been identified in this case as Kevin Cheval and Samuel Riggs. That is not in dispute. [¶] Three, neither Kevin Cheval nor Samuel Riggs murdered Sunshine. That is not in dispute. That no one is saying it was Kevin or it was Samuel who killed Mr. James. Four, whoever came with Kevin Cheval and Samuel Riggs murdered Sunshine. That is not in dispute. That is, it was three men who entered, two of the men were Kevin Cheval and Samuel Riggs. The person who murdered Melvin James was the third person that they came in with. [¶] Four—I mean, five, Sunshine was murdered during the attempted commission of a robbery. That is not in dispute here. Sunshine struggled with the murderer over the gun. That is not in dispute here. That Sunshine was murdered using a rifle, that's not in dispute here. That Sunshine was shot twice, and the bullets traveled

downward from the upper body to the lower body. That is not in dispute here. That both Kevin Cheval and Samuel Riggs told detectives that the defendant was the third person in their group. That is not in dispute here. That, Rickey Marks told detectives he saw Kevin Cheval, Samuel Riggs, and Insane, that we know aka was the defendant, arrive at the location and then leave the location after the shooting in a Ford Taurus. That is not in dispute here. That Tonia Taylor identified Samuel Riggs as the guy doing all the talking and tentatively identified the defendant as the shooter, that is not in dispute here."

The prosecutor continued: *"The only question in this case is who was the third man with Kevin Cheval and Samuel Riggs? That's the only question.* How do we know the defendant was the third man? How do we know this? From Tonia Taylor, from Rickey Marks, from Samuel Riggs, from Kevin Cheval. When you put all their testimonies together and what they told the police, that's how you know it was the defendant who was the third man who did all those acts that are not in dispute." (Italics added.) The prosecutor then reviewed the evidence in detail.

Defense counsel, too, rested his closing argument on identification. He addressed inconsistencies in the evidence, and emphasized that the DNA under the victim's fingernails was not appellant's. "The question is, whether or not identification has been proved beyond a reasonable doubt. That's the issue in this case. [¶] You tell me, do you have a reasonable doubt as to the identification of the shooter or not? Look at the DNA. I think that's your reasonable doubt, if nothing else. Someone's DNA is under those nails, and we don't know whose it is. Now, the district attorney wants you to say, oh, maybe he picked it up days before. He picked it up days before and he never washed his hands and it's still there, but the struggle that he had with someone over a gun with his hands, and he didn't pick up DNA?"

In response to defense counsel's argument that she had glossed over the issue of identification, the prosecutor argued that "the entire part of my argument was all about, who was the third man, the identification of the third man . . . ."

Based on the evidence presented, the jury could credit the witnesses who identified appellant as the "third man" who shot James, or it could credit appellant's claim of misidentification. There was no evidence, and no argument, that appellant was present at the scene of the charged crimes but did not commit the crimes.

Respondent argues that the jury could have rejected evidence that appellant was the shooter, but still credit Cheval's testimony that appellant was in possession of a gun after the shooting. Cheval testified that appellant had a

gun in his hand when he came back to the car, and that appellant hit him with the gun and demanded that Cheval drive them away. The jury obviously rejected this testimony, since it acquitted appellant of the kidnapping charge and of the lesser crime of false imprisonment. The trial court simply disagreed with the jury's factual determination. The court reviewed the testimony at trial and concluded: "I have no doubt whatsoever that the defendant was present at that house, had a gun, pulled a gun and during a struggle, killed the victim in this case. I don't agree with the jury's findings in this case. . . . So I have no doubt that [appellant] had a gun and that he used it both in there and in the room where the victim was killed and to strike Kevin Cheval. I don't know what was in the jury's mind as far as the robbery goes. But [witness] Taylor's testimony was clear that the person that pulled the gun was attempting to take money from the victim, and it seems to have been ignored by the jury."

 The jury found appellant not guilty of the charged crimes, rejecting the identification of appellant as the third man who entered the house with Riggs and Cheval and committed the murder and attempted robbery, or who by use of a gun forced Cheval to drive them away, committing either kidnapping or false imprisonment. The jury necessarily had a reasonable doubt that appellant was the person with a gun at the crime scene. We note the jury was instructed on aiding and abetting. The not guilty verdicts establish that the jury also had a reasonable doubt that appellant participated in the charged crimes, even if he was not the shooter.

This issue having been conclusively decided by the verdict, the court could not relitigate the question of appellant's presence with a gun at the crime scene in the subsequent bench trial of the felon-in-possession charge. The judgment must be reversed.

## DISPOSITION

The judgment is reversed.

Suzukawa, J., concurred.

**WILLHITE, J.,** Concurring.—I concur in the opinion. I write separately to emphasize three points.

First, it is apparent from the record that the trial court, the prosecutor, and trial defense counsel assumed that in the severed court trial on the charge of felon in possession of a firearm, the court would not be conclusively bound

by a jury verdict of acquittal in the trial of the other charges. Indeed, that was the core assumption of the bargain the court struck in granting the severance motion—appellant received the benefit of the severance, preventing the jury from learning that he was a convicted felon; in exchange, he submitted to the court's unrestricted judgment in a separate nonjury trial on the charge of being a felon in possession of a firearm. This core assumption, however, was not made an express condition of the severance and of appellant's jury waiver on the charge of being a felon in possession of a firearm. Had such an express condition been imposed and agreed to by appellant, I would conclude that appellant waived the collateral estoppel effect, under *Ashe v. Swenson* (1970) 397 U.S. 436, 443 [25 L.Ed.2d 469, 90 S.Ct. 1189] (*Ashe*), of the jury's verdict.

Second, even with such an express waiver, the type of procedure attempted here—a jury trial on some charges arising from a single incident, with no collateral estoppel effect on a severed nonjury trial on a remaining charge arising from the same incident—is problematic. The jury's verdict of acquittal in such an arrangement is a final determination, "in the sense that no further judicial act remains to be done to end the litigation" on the charges to which the acquittal applies. (*People v. Scott* (2000) 85 Cal.App.4th 905, 919 [102 Cal.Rptr.2d 622].) But it is only *after* such a verdict that one can know the full extent of collateral estoppel effect created by the verdict. As stated in *Ashe*: "The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' [Citation.]" (*Ashe, supra*, 397 U.S. at p. 444, fn. omitted.) In my view, the uncertainty in the breadth of collateral estoppel effect inherent in the *Ashe* analysis makes the type of severance procedure contemplated here unwise.

Finally, should any court in the future contemplate severance under an arrangement like that contemplated here (though I do not recommend it), the court should ensure that (1) the defendant is expressly advised that a jury verdict of not guilty on one or more of the charges, and the factual findings inherent in that verdict, might well be binding on the court in its determination of the remaining charge arising out of the same incident, and

(2) the defendant expressly agrees that regardless of whether the jury acquits him on one or more of the charges it determines, and regardless of the factual findings implicit in the jury's verdict of acquittal, the court may nonetheless make different factual findings and convict him of the charge the court determines.