[No. B213003. Second Dist., Div. Five. Apr. 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
SHON RAMONE YOKELY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion, parts B. through H.

COUNSEL

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—

## INTRODUCTION

Shon Ramone Yokely (defendant) was convicted of murder in 1992. A federal district court granted defendant a writ of habeas corpus based on its

findings that defendant's constitutional rights had been violated because his attorney was not present at a live lineup at which two eyewitnesses identified defendant as the murderer, and because his attorneys had failed to object to admission of the lineup and in-court identifications by those witnesses at defendant's trial.[1] At defendant's retrial, the trial court independently determined that the testimony of those two witnesses had origins independent of the tainted lineup, and admitted their identification testimony. Defendant again was convicted of murder.

We hold that the findings of the federal district court did not preclude the trial court from determining independently the admissibility of the in-court identification testimony of the two witnesses, and that there is substantial evidence to support the trial court's conclusion that the identification testimony of both witnesses had an origin independent of the illegal live lineup. We reject defendant's other claims of trial error, and we correct certain errors made by the trial court in sentencing defendant. As modified, we affirm the judgment.

## BACKGROUND

### A. *Factual Background*[2]

#### 1. *The Murder*

Shortly after 7:00 p.m. on Sunday, July 7, 1991, Katie Jones[3] and her 14-month-old daughter, Mitchshalae, arrived at their home in the Willowbrook area of Los Angeles. Katie and Mitchshalae lived at the house with Katie's mother. Katie's brothers John Paul and Albert were in the front yard.

Katie parked her car on the street in front of the house. She put Mitchshalae on the sidewalk and began to unload the trunk. Albert came out to help Katie; he lifted Mitchshalae over the fence separating the front yard from the street, and handed her to John Paul. John Paul set Mitchshalae down so she could walk into the house.

John Paul saw a blue Jeep Cherokee turn onto the street with loud music playing. The car approached slowly with the windows down. John Paul said

---

[1] We grant defendant's request for judicial notice of the district court's findings, which findings were before the trial court. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[2] On appeal, "we must view the evidence in the light most favorable to the verdict and presume the existence of each fact that a rational juror could have found proved by the evidence. [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 139–140, fn. 30 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

[3] We sometimes refer to the members of the Jones family by their first names for ease of reference.

he saw three African-American men in the car. The man sitting behind the driver was light skinned, had a dry Jheri curl hairstyle, and his ears "poked out" from his head. John Paul later identified that man as defendant, both from a photo lineup and in open court. Defendant put his arms and upper body through the window. He was holding a black firearm in both hands out in front of him. Defendant started shooting.

Albert was shot in the shoulder and fell to the sidewalk bleeding. As Katie went toward him, she was hit in the left leg above the knee. John Paul ran toward Mitchshalae, but he fell when a bullet struck him in the right leg and shattered his femur. He crawled toward Mitchshalae, who was lying on her back in the yard. Mitchshalae had been shot in the face. She was conscious, but John Paul could see her brains coming out of her mouth. He covered her with his body so that Katie could not see her. Before help arrived, Mitchshalae died.

The Jeep Cherokee sped away.

### 2. *Testimony of Vernon Cox*

In July 1991, Vernon Cox was 15 years old. Cox formerly was an associate of the Holmes Street Watts Crips street gang. Cox had a friend named Rance Hill who lived in an apartment near 125th Street and Western Avenue, approximately two miles from the Jones residence.

On July 7, Cox went to visit Hill. He found Hill leaving his apartment building in a blue Jeep Cherokee driven by Darrell Whitson. Whitson was a member of the 118th Street East Coast Crips street gang, with the gang moniker "Little D." The Crip gangs were rivals of Blood gangs. Cox joined Hill and Whitson in the Jeep.

The three young men drank cognac and beer and smoked marijuana at various locations before returning to Hill's apartment. Cox, who had not eaten, vomited; he felt better after doing so. Hill asked Cox and Whitson to leave the apartment for a while so that he could be alone with a girl.

Cox and Whitson went back to the Cherokee. Whitson drove; Cox was in the passenger seat. Whitson drove east into territory controlled by the East Coast Crips. Whitson saw a friend of his and stopped the Cherokee. Cox identified Whitson's friend as defendant.

Whitson and defendant talked for a minute or two. Defendant asked Whitson what he was about to do. Whitson answered that they were going to roll around to see if they could see some Bloods. Defendant said he wanted to

come along. Defendant ran toward a house; when he came back, he appeared to be holding something in his waistband. Defendant got in the back of the Cherokee. Whitson drove generally southward, into territory controlled by the Athens Park Boys, a Blood street gang.

After a few minutes, the Cherokee turned left onto the street where the Joneses lived. Cox saw two men standing near the second house on the block. As they drove past the house, Cox heard three gunshots; he saw the men going down, and could not tell whether they were ducking or had been shot. Cox saw defendant leaning out of the driver's side rear window of the Cherokee, holding a black gun in both hands. They drove away, and dropped defendant off near where they had picked him up. Defendant said that he was going to put the rest of the bullets in his gun, but Whitson and Cox did not wait for him. They drove back to Hill's apartment building.

Two months later, the police came to Cox's home to interview him about the shooting. Cox cooperated. Cox identified Whitson as the driver of the Jeep from a photo lineup. He identified defendant as the shooter from another photo lineup, although he told police that he was "not 100 percent sure." Cox said that the picture of defendant looked most like the shooter. Cox explained that, at the time, he did not know defendant and did not know what might happen to him if he identified defendant, but he "tried his best to do what [he] thought was right." Cox testified at trial in this case (in 2008) that he had also identified defendant as the shooter at a court proceeding in 1992. Cox was granted immunity in exchange for his testimony.

### 3. *Other Evidence*

John Paul Jones gave the police a description of the shooter in the hospital the night of the shooting. The description generally matched defendant's appearance. Police found the blue Jeep Cherokee the next day. The vehicle was traced to Whitson, who, it appears, implicated defendant. Police asked defendant to come to the police station voluntarily for questioning. As a deputy sheriff transported defendant to the station, defendant told the deputy that he was a former member of the 118th Street East Coast Crips, known by the gang moniker "Calbo." A gang expert testified that the 118th Street East Coast Crips were deadly rivals of the Athens Park Boys, a Blood gang.

When interviewed by police, defendant stated that on the day of the murder, he had been at a motel on Western Avenue with a girl who was visiting the area from Arizona. Police checked the registration records of the motel and were unable to verify defendant's alibi. Defendant presented similar alibi testimony at trial. Defendant denied that he was a member of the 118th Street East Coast Crips; he testified that he used to be associated with a different clique of the East Coast Crips based in Carson.

### B. Procedural Background

#### 1. Original Trial and Writ of Habeas Corpus

In November 1992, a jury convicted defendant of one count of first degree murder (Pen. Code, § 187, subd. (a)),[4] three counts of attempted murder (§§ 664, 187, subd. (a)), and one count of conspiracy to commit murder (§ 182, subd. (a)(1)). Defendant was sentenced to four consecutive life terms. His convictions were affirmed on direct appeal.

In May 2007, the United States District Court for the Central District of California (the district court), in adopting the report and recommendation of a United States magistrate judge, granted defendant's petition for a writ of habeas corpus. The district court concluded that defendant's Sixth Amendment right to counsel was violated because defendant's attorney was not present at a live lineup at which Vernon Cox, John Paul Jones and Albert Jones identified defendant as the shooter. The district court further concluded that defendant had been denied the effective assistance of counsel at his trial because his trial counsel failed to object to the admission of testimony regarding the live lineup identifications, which testimony was excludable per se, and to the in-court identifications of defendant by Vernon Cox and John Paul Jones. The district court found that defendant was prejudiced by trial counsel's failure to object to the in-court identification by Vernon Cox because, based on the record of defendant's trial, the prosecution probably could not have established by clear and convincing evidence that Cox's identification of defendant was not tainted by the unconstitutional live lineup. The district court found that, had Cox's identification been excluded, there was a reasonable probability that defendant would not have been convicted. The district court also found that, had defendant moved to suppress the in-court identification by John Paul Jones, the prosecution would have been able to establish by clear and convincing evidence that the identification was not tainted by the illegal lineup.

#### 2. Retrial and Sentencing

In June 2007, a new information was filed charging defendant with the murder of Mitchshalae Jones (§ 187, subd. (a)) (count 1), the attempted murders of Katie, Albert and John Paul Jones (§§ 664, 187, subd. (a)) (counts 2, 3 and 4), and conspiracy to commit murder (§ 182, subd. (a)(1)) (count 5). The information specially alleged that defendant inflicted great bodily injury (GBI) on each of his victims by discharging a firearm from a motor vehicle (§ 12022.55), that a principal in the charged crimes was armed with a

---

[4] All further statutory references are to the Penal Code, unless otherwise indicated.

handgun (§ 12022, subd. (a)(1)), that defendant personally used a handgun (§ 12022.5, subd. (a)), and that defendant personally inflicted GBI on each of his victims (§ 12022.7, subd. (a)).

Defendant made a pretrial motion to suppress in-court identification by Vernon Cox or John Paul Jones unless the prosecution proved the identification had an origin independent of the illegal live lineup. At the hearing on the motion, defense counsel argued that the trial court was bound by the district court's finding that the prosecution could not establish that the identification by Vernon Cox had an origin independent of the illegal lineup. The trial court rejected defendant's contention on the ground that there had been no evidentiary hearing on independent origin either at defendant's original trial or before the district court on habeas corpus; the issue decided by the district court was whether defendant had been prejudiced at his original trial by the violations of his Sixth Amendment rights. Accordingly, the trial court ordered an evidentiary hearing to permit the prosecution to attempt to establish an independent origin for the identifications by both Vernon Cox and John Paul Jones. After hearing testimony from Cox, John Paul, and defendant at the hearing, the trial court denied defendant's motion and ruled that the prosecution had established by clear and convincing evidence that the identifications of defendant as the shooter by both Cox and John Paul had an origin independent of the illegal lineup.

After the jury was selected but prior to opening statements, defendant elected to represent himself at trial and was granted in propria persona status by the trial court. The jury convicted defendant as charged on all counts. The jury found true the firearm enhancement allegations as to counts 1 through 4, and found true the GBI special allegations with respect to Mitchshalae (count 1) and John Paul (count 4) only. The trial court sentenced defendant to four consecutive life terms on counts 1 through 4.[5] The trial court imposed a term of 25 years to life on count 5, and stayed execution of the sentence on that count pursuant to section 654. Defendant timely appealed.

## DISCUSSION

### A. *In-court Identification Testimony*

#### 1. *Relevant General Principles*

■ Under the Sixth Amendment to the United States Constitution, a defendant has a right to have counsel present at a live lineup held after

---

[5] The trial court also imposed firearm and GBI enhancements on counts 1 through 4 that are discussed in the unpublished portion of the opinion.

criminal proceedings have commenced. (*United States v. Wade* (1967) 388 U.S. 218, 236–237 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert v. California* (1967) 388 U.S. 263, 272–273 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; see also *Moore v. Illinois* (1977) 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458]; *Kirby v. Illinois* (1972) 406 U.S. 682, 689 [32 L.Ed.2d 411, 92 S.Ct. 1877]; *People v. Cook* (2007) 40 Cal.4th 1334, 1352–1353 [58 Cal.Rptr.3d 340, 157 P.3d 950].) When a live lineup violates a defendant's Sixth Amendment rights, evidence of identifications made at the lineup is subject to a per se exclusionary rule. (*Gilbert v. California, supra*, 388 U.S. at pp. 272–273; *United States v. Wade, supra*, 388 U.S. at pp. 236–237; see generally 2 LaFave et al., Criminal Procedure (3d ed. 2007) § 7.3(f), p. 926 (LaFave).) Nevertheless, a witness who participated in such an illegal lineup *may* identify the defendant at trial, provided the prosecution establishes by clear and convincing evidence that the in-court identification had an origin independent of the illegal lineup. (*United States v. Wade, supra*, 388 U.S. at p. 241; *People v. Ratliff* (1986) 41 Cal.3d 675, 689 [224 Cal.Rptr. 705, 715 P.2d 665].)

### 2. Collateral Estoppel/Law of the Case

In assessing whether defendant was prejudiced by his counsel's ineffective assistance at his first trial, the district court examined the trial record "to determine whether the government would have been able to establish by clear and convincing evidence that the in-court identifications had a basis independent of the illegal lineup." After examining Cox's trial testimony, the district court concluded that the "record demonstrate[d] a *reasonable probability* that the prosecution *would have been unable* to establish by clear and convincing evidence that the in-court identification by Cox was independent of the illegal lineup." (Italics added.) The district court expressly acknowledged that "[b]ecause there was no motion to suppress filed, the prosecutor did not have the opportunity to establish the existence of an independent origin of the in-court identifications . . . ."

Defendant argues that, under the doctrines of collateral estoppel and law of the case, the trial court was bound by the district court's conclusion and was precluded from determining independently whether Cox's in-court identification of defendant had an independent origin. We disagree.

■ Under the doctrine of collateral estoppel, a party cannot relitigate an issue of ultimate fact that was determined by a valid and final judgment in a previous lawsuit between the same parties. (*Ashe v. Swenson* (1970) 397 U.S. 436, 443 [25 L.Ed.2d 469, 90 S.Ct. 1189] (*Ashe*); *People v. Barragan* (2004) 32 Cal.4th 236, 252–253 [9 Cal.Rptr.3d 76, 83 P.3d 480] (*Barragan*); *People v. Santamaria* (1994) 8 Cal.4th 903, 912 [35 Cal.Rptr.2d 624, 884 P.2d 81] (*Santamaria*).) In criminal cases, this doctrine is an aspect of the Fifth

Amendment's protection against double jeopardy. (*Ashe, supra,* 397 U.S. at p. 445; *Schiro v. Farley* (1994) 510 U.S. 222, 232 [127 L.Ed.2d 47, 114 S.Ct. 783]; *Santamaria, supra,* 8 Cal.4th at p. 912.) Collateral estoppel applies only if five requirements are met: (1) the relevant issue must be identical to that decided in the prior proceeding; (2) the issue actually must have been litigated in the prior proceeding; (3) the issue necessarily must have been decided in the prior proceeding; (4) the decision in the prior proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be identical to or in privity with the party to the prior proceeding. (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077 [48 Cal.Rptr.3d 75, 141 P.3d 197]; *People v. Cooper* (2007) 149 Cal.App.4th 500, 518 [57 Cal.Rptr.3d 389] (*Cooper*).) The burden is on the defendant to establish the factual predicate for the doctrine to apply. (*Schiro v. Farley, supra,* 510 U.S. at p. 233; *Cooper, supra,* 149 Cal.App.4th at p. 519.) We do not apply collateral estoppel "with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." (*Ashe, supra,* 397 U.S. at p. 444; accord, *Santamaria, supra,* 8 Cal.4th at p. 912.) The California Supreme Court and Courts of Appeal have expressed doubt that the doctrine of collateral estoppel applies in further proceedings in the same litigation, such as a defendant's retrial after his or her conviction is set aside for reasons other than the legal sufficiency of the evidence. The issue, however, has not been resolved definitively. (See *Barragan, supra,* 32 Cal.4th at p. 253; *Santamaria, supra,* 8 Cal.4th at pp. 913–914; *People v. Gordon* (2009) 177 Cal.App.4th 1550, 1557 [100 Cal.Rptr.3d 94]; *Cooper, supra,* 149 Cal.App.4th at p. 519.) We need not resolve the issue in this case because, as we will discuss, defendant's claim of collateral estoppel would fail even if the doctrine could apply.

█ Under the law-of-the-case doctrine, the determination by an appellate court of an issue of law is conclusive in subsequent proceedings in the same case. (*People v. Boyer* (2006) 38 Cal.4th 412, 441 [42 Cal.Rptr.3d 677, 133 P.3d 581].) The doctrine applies only if the issue was actually presented to and determined by the appellate court. (*People v. Gray* (2005) 37 Cal.4th 168, 197 [33 Cal.Rptr.3d 451, 118 P.3d 496].) The doctrine is one of procedure that prevents parties from seeking reconsideration of an issue already decided absent some significant change in circumstances. (*People v. Boyer, supra,* 38 Cal.4th at p. 441.) But the law-of-the-case doctrine does not limit the evidence that may be offered on the retrial of an issue of fact, and it controls the outcome of a retrial only if the evidence is substantially the same. (*Id.* at p. 442; *Barragan, supra,* 32 Cal.4th at pp. 246–247.) Accordingly, the law-of-the-case doctrine does not preclude the presentation of new evidence on a suppression issue after a conviction has been reversed and the cause remanded for a new trial. (*People v. Boyer, supra,* 38 Cal.4th at p. 442; see also *Cooper, supra,* 149 Cal.App.4th at pp. 526–527 [law-of-the-case

doctrine did not apply to subsequent retrial of defendant after habeas corpus relief granted and new evidence was presented on retrial].)

Defendant's arguments based on the doctrines of collateral estoppel and law of the case both fail for the same reason: the issue determined by the trial court in this case with respect to the admissibility of Cox's in-court identification was *not* the same issue previously determined by the district court. The issue resolved by the district court was whether defendant was prejudiced by his trial counsel's failure to move to suppress Cox's in-court identification—that is, whether it was reasonably probable, *based on the record of the first trial*, that defendant would have received a more favorable result had his trial counsel made a motion to suppress. The district court did not hold an evidentiary hearing, and it received no testimony from Cox. Instead, the district court examined Cox's *trial* testimony to determine whether there was "a *reasonable probability* that the prosecution *would have been unable* to establish by clear-and-convincing evidence that the in-court identification by Cox was independent of the illegal lineup." (Italics added.) In other words, the district court examined a trial transcript in an effort to ascertain what probably would have happened at a hypothetical suppression hearing, at which the evidence presented was identical to Cox's trial testimony. As the district court cautioned in its findings, the scope of its determination was limited: "Because there was no motion to suppress filed," the district court stated, "the prosecutor did not have the opportunity to establish the existence of an independent origin of the in-court identification[] made by . . . Cox."

In contrast, the trial court in this case was not tasked with determining what probably would have happened at a hypothetical suppression hearing. The issue before the trial court was the factual determination of whether, based on the evidence presented at a suppression hearing, there was clear and convincing evidence that Cox's identification of defendant as the shooter had an origin independent of the illegal live lineup. The trial court held an evidentiary hearing and received testimony from Cox regarding the basis for his identification.

Furthermore, although the transcripts of defendant's first trial are not part of the record on this appeal,[6] it appears the evidence at the suppression hearing differed in material respects from the trial testimony relied upon by the district court. For example, unlike the trial court in this case, the district

---

[6] Although both parties relied on the transcripts of defendant's 1992 trial in arguing the motion to suppress, the record clearly establishes that the transcripts were not provided to or considered by the trial court in denying the motion to suppress. The trial court based its decision on the suppression motion on the district court's written findings and Cox's live testimony taken at the suppression hearing, both of which are included in the record on appeal. Accordingly, the record before us is adequate to permit our review of the collateral estoppel issue.

court had no opportunity to observe Cox testify or to evaluate his credibility. Based on its review of the trial transcripts, the district court thought it significant that Cox had little time to observe the shooter because Whitson picked the shooter up close to the scene of the shooting; the shooter was wearing a hat; Cox was intoxicated at the time of the shooting; and Cox's pre-live-lineup photo identification of defendant was equivocal based on Cox's statement that the photo looked "mostly like" defendant. Cox testified at the suppression hearing, however, that notwithstanding his intoxication, he was alert when Whitson stopped the Jeep to pick up defendant. Whitson spoke with defendant "for a little while" before defendant got in the car; Cox observed defendant during that time and was able to see his face. Cox then watched defendant run to the house to get something, and Cox saw defendant when he came back to the car. From the front passenger seat of the Jeep, Cox saw defendant pulling himself back in through the rear driver's side window after defendant fired the shots that killed Mitchshalae and wounded the Jones siblings. Cox identified both Whitson and defendant from photo lineups prior to the illegal live lineup. Cox testified that he had identified defendant as the shooter at the first trial, and that his identification was not based on the illegal live lineup—his identification was based on his observations of defendant in court and because defendant was "the person that was in the car." When examined by the trial court, Cox explained that he told police he was not certain about the photographic identification because he was scared—he had heard about what happened to people who testified against someone accused of a driveby shooting, and he "didn't want to be that individual."

■ The issues before the district court and the trial court were thus different. Although both issues concerned the origin of Cox's in-court identification, the two determinations were based on different procedures and different evidence. Although the analogy is inexact, one might view the difference between the decisions of the district court on habeas corpus and the trial court after the suppression hearing as similar to the decisions made in a civil case, first on a motion for summary judgment and then after trial. Both decisions, for example, might involve a plaintiff's fraud claim, but the determination on summary judgment that a plaintiff submitted evidence sufficient to raise a triable issue of fact does not preclude the trier of fact from later determining independently after trial that the plaintiff failed to prove his case by a preponderance of the evidence. The doctrines of collateral estoppel and law of the case did not bar the trial court from determining independently whether Cox's in-court identification had an independent origin.

### 3. *Denial of Motion to Suppress*

The trial court held an evidentiary hearing to determine whether to admit the in-court identification testimony of Vernon Cox and John Paul Jones, and

found by clear and convincing evidence that both witnesses had a basis independent of the illegal lineup to identify defendant as the shooter. On appeal, defendant argues that the evidence adduced at the suppression hearing was insufficient to support the trial court's ruling.

 Whether the in-court identifications were admissible presents a mixed question of law and fact. (See *People v. Kennedy* (2005) 36 Cal.4th 595, 608–609 [31 Cal.Rptr.3d 160, 115 P.3d 472].) "Mixed questions of law and fact are those where the facts are established, the law is undisputed, and the issue is whether the law as applied to the established facts is violated. [Citation.] The constitutionality of an identification procedure presents a mixed question of law and fact. [Citation.]" (*Id.* at p. 608.) Accordingly, we review the trial court's findings of historical fact for substantial evidence. (*Ibid.*; see *People v. Ratliff, supra*, 41 Cal.3d at p. 689 & fn. 2.) We review independently whether those factual findings established that admission of the in-court identifications satisfied the constitutional requirement that they had an origin independent of the illegal live lineup. (See *People v. Kennedy, supra*, 36 Cal.4th at p. 609.) When considering whether the identification has an independent source, the court should consider such factors as the witness's opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification by the witness prior to the lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the period of time between the alleged act and the lineup identification. (*United States v. Wade, supra*, 388 U.S. at p. 241; *People v. Cooks* (1983) 141 Cal.App.3d 224, 306 [190 Cal.Rptr. 211]; see also 2 LaFave, *supra*, § 7.3(f), pp. 926–927.)

#### a. *Vernon Cox*

The trial court stated that it had observed Cox testify, asked him questions, and found his testimony credible. The trial court was satisfied that Cox truthfully answered that his apparent equivocation in identifying defendant's photograph in the photo lineup was not because he was uncertain, but because he was frightened.

##### (i) *The witness's opportunity to observe the alleged criminal act.*

There was substantial evidence that Cox had ample opportunity to observe defendant at the time of the shootings. As discussed, Cox testified that Whitson spoke with defendant "for a little while" before defendant got in the car. Cox observed defendant during that time and was able to see his face. Cox watched defendant run to the house to get something, and Cox saw

defendant when he came back to the car. From the front passenger seat of the Jeep, Cox saw defendant pulling himself back in through the rear driver's side window after defendant fired the shots. Cox also observed defendant when he got out of the car after the shooting.

Defendant argues that, although Cox might have had time to observe defendant, his ability to do so was impaired because he was intoxicated. Cox testified, however, that he "felt better" after he vomited and eliminated some of the intoxicants out of his system. He had not had anything to drink or smoke for approximately 45 minutes before he left Rance Hill's apartment with Whitson. Cox further testified that, notwithstanding his intoxication, he was alert when Whitson stopped the Jeep to pick up defendant. Moreover, the circumstances in which Cox observed defendant were undoubtedly memorable: Cox testified that the day of the shooting would be "burned in [his] mind" for "the rest of [his] life," and that 17 years later he still would not "even get in a Jeep Cherokee."

> (ii) *Any discrepancy between any pre-lineup description and the defendant's actual description.*

There was no evidence that Cox gave an inaccurate description of defendant. Defendant argues that there were some discrepancies between the testimony of Cox and John Paul Jones regarding defendant's appearance—specifically, whether defendant was wearing a baseball cap and whether defendant had on a track suit or jacket. But there was no difference in the testimony regarding defendant's basic appearance, including the light color of his skin and his distinctive hairstyle. Moreover, eyewitnesses to crimes frequently differ in their testimony as to details. Although such differences are a proper subject of argument to the trier of fact, they do not render a witness's identification constitutionally suspect. In this case, the trial court found Cox to be a credible witness.

> (iii) *Any identification by the witness prior to the lineup of another person.*

There was no evidence that Cox identified any other person. To the contrary, Cox identified defendant consistently from his first contact with police. The record demonstrates that Cox identified defendant as the shooter from a photo lineup, at a live lineup, at the first trial, at the suppression hearing, and at the second trial.

> (iv) *The identification by picture of the defendant prior to the lineup.*

Cox identified both Whitson and defendant from photo lineups prior to the illegal live lineup. Defendant argues that Cox's identification was "uncertain,"

because Cox said the photo looked "mostly like defendant" and was not "100 percent sure." Cox, however, explained to the trial court that he told police he was not certain about the photographic identification because he was scared—he had heard about what happened to people who testified against someone accused of a driveby shooting, and he "didn't want to be that individual." The trial court found that explanation to be credible.

Defendant also questions the validity of the photo array shown to Cox, but defendant did not move to suppress Cox's photo identification and did not object to its admission at trial. Insofar as the record reflects, there has been no finding by any court that the photo array was unduly suggestive.

> (v) *Failure to identify the defendant on a prior occasion.*

There was no evidence that Cox failed to identify defendant as the shooter when given the opportunity to do so.

> (vi) *Lapse of time between the alleged act and the lineup identification.*

Defendant argues that Cox's identification at the photo lineup was unreliable because the photo lineup occurred two months after the shooting. The photo lineup preceded the illegal live lineup, however, so Cox's ability to identify defendant from the photo lineup after two months tends to support rather than undermine the conclusion that Cox's in-court identification was based on his observation of defendant on the day of the shooting. As noted, Cox testified at the suppression hearing that he identified defendant as the shooter because he recognized defendant as "the person that was in the car."

Defendant's reliance on *Tomlin v. Myers* (9th Cir. 1994) 30 F.3d 1235 is unpersuasive. In that case, a panel of the Ninth Circuit held that the prosecution had failed to establish an independent origin for a witness's identification of a suspect when the witness saw the suspect after the suspect "barge[d]" into a truck in "a dark alley" and almost immediately fired his gun at close range; the suspect sat in a position that made it "difficult" for the witness to see the suspect "full-face"; and there were material discrepancies between the witness's initial description of the suspect and his actual appearance. (*Id.* at pp. 1241–1242.) The witness also had testified in habeas corpus proceedings that the detectives had "exchanged glances that led her to choose" the suspect's photograph from a photo lineup. (*Id.* at p. 1242.) In contrast, the shootings in this case occurred in daylight; there was substantial evidence that Cox had ample opportunity to see defendant's face; and there was no evidence that Cox misdescribed or misidentified defendant, or that he

was coached or induced by police to identify him. There was substantial evidence to support the trial court's factual findings, and the trial court correctly concluded that the prosecution established by clear and convincing evidence that Cox's identification had an origin independent of the illegal live lineup. The trial court did not err in admitting Cox's in-court identification.

### b. *John Paul Jones*

The trial court found that John Paul Jones's testimony was both detailed and credible. Although his opportunity to view defendant at the time of the shooting was brief, the trial court believed John Paul's statement that his identification of defendant was based on what he observed on the day of the shooting.

The factors described above support the trial court's conclusion that John Paul's in-court identification had an origin independent of the illegal live lineup. John Paul testified that it was daylight when the shootings occurred, and he had no problems with his eyesight. He saw the Cherokee as it turned left onto Carlton Avenue and proceeded slowly toward the house. He saw that the Cherokee had three occupants—a driver, someone in the passenger seat, and a person in the back. John Paul testified that he got a "good look at the shooter" and that the shooter looked in his direction before he shot.

After the shooting, John Paul accurately described both Whitson and defendant to police. While still in the hospital, John Paul told police that he "was sure that [he] could identify the shooter and the driver." John Paul identified both Whitson and defendant from photo lineups. He testified that the faces of both men were "burned in [his] memory forever." At the live lineup, John Paul not only identified defendant, but accurately informed police that defendant had cut his hair since the day of the shooting. John Paul testified that his in-court identification of defendant at the first trial was not because of the live lineup, but because defendant was the shooter. There was no evidence of any discrepancy between John Paul's description and defendant's actual appearance; that John Paul had identified any other person as the shooter; or that John Paul ever failed to identify defendant as the shooter when given the opportunity to do so.

Defendant argues that John Paul's identification is nevertheless tainted by the illegal lineup because John Paul estimated that he had only seven or eight seconds under difficult circumstances to observe defendant at the time of the shooting. That fact is not dispositive, however. The trial court found that John Paul's testimony regarding his observations on the day of the shooting were credible. Moreover, John Paul accurately described defendant shortly after the shooting, and identified him from a photo lineup prior to the live lineup. Thus, there is substantial evidence to support the conclusion that John Paul had a

sufficient opportunity to observe defendant for purposes of making his in-court identification. The trial court did not err in admitting John Paul's in-court identification.

B.–H.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is modified to (1) strike the sentence enhancements pursuant to sections 12022.55 and 12022.7 on counts 2 and 3; (2) lift section 654 stays with respect to the sentence enhancements pursuant to section 12022.5, subdivision (a) on counts 2 and 3; and (3) reduce the sentence enhancements pursuant to section 12022.55 on counts 1 and 4 from six years to five years. The clerk of the superior court is to prepare a corrected abstract of judgment and forward it to the California Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

Turner, P. J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 2010, S182699. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 1264.