Filed 11/3/20 P. v. Peralez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046144 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1524108) |
| v. | |
| DANNY GARCIA PERALEZ, | |
| Defendant and Appellant. | |

A jury convicted appellant Danny Garcia Peralez of first degree robbery while acting in concert with others, attempted murder, three first degree burglaries, attempted burglary, and various gang and firearm sentencing enhancements. In addition, the trial court found true a prior serious felony conviction allegation and a prior strike conviction allegation. The trial court sentenced Peralez consecutively to an indeterminate term of 30 years to life in prison plus a five-year sentence enhancement for the prior serious felony and a determinate term of 29 years and eight months plus the five-year prior serious felony enhancement.

On appeal, Peralez raises four claims. He contends a pretrial identification procedure was unnecessarily suggestive and tainted the eyewitness's identification of him, the trial evidence was insufficient to support the jury's findings on the gang enhancements, the jury instruction on eyewitness identification (CALCRIM No. 315) was

flawed because it permitted consideration of the eyewitness's level of certainty, and the matter should be remanded so the trial court may exercise its newly conferred sentencing discretion under Senate Bill No. 1393 (2017-2018 Reg. Sess.) on the prior serious felony enhancement.

For the reasons explained below, we reverse the judgment and remand the case to allow the trial court to exercise its discretion whether to strike the prior serious felony enhancement under Penal Code sections 667, subdivision (a), and 1385. We reject Peralez's other claims of error.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

On December 1, 2016, the Santa Clara County District Attorney filed an information charging Peralez with six counts related to four incidents that occurred on October 22, 2015.[1] The information alleged that Peralez committed first degree robbery while acting in concert with other persons (Pen. Code, §§ 211, 213 subd. (a)(1)(A);[2] count 1), attempted murder of Albert S.[3] (§§ 187, 664, subd. (a); count 2), three, first degree burglaries (§§ 459, 460, subd. (a); counts 3, 4 & 6), and attempted first degree burglary (§§ 459, 460 subd. (a), 664 subd. (a); count 5). In addition, the information stated a gang sentencing enhancement allegation in each count. (§ 186.22, subd. (b)(1) & (4).) The first three counts each included a firearm sentencing enhancement allegation (§§ 12022.53, subds. (b), (c), (d) & (e) [counts 1 & 2], 12022.5, subd. (a) [count 3]), and counts 3 and 5 each included an allegation that a person not an accomplice was present in the residence during the crime (hereafter "presence" allegation). (§ 667.5, subd. (c)(21).) The information further alleged that Peralez had a prior serious felony conviction (§667,

---

[1] Unless otherwise indicated, all dates occurred in 2015.

[2] Unspecified statutory references are to the Penal Code.

[3] To protect the privacy of the victims, we refer to them initially by their first name and the first initial of their last name. At times thereafter, we refer to the victims by their first names only. (Cal. Rules of Court, rule 8.90(b)(4).)

subd. (a)) for possession of a firearm by a felon (§ 12021), a prior strike conviction (§§ 667, subd. (b)–(i), 1170.12), and two prior felony convictions for which he had served prison terms (hereafter "prison prior" allegations) (§ 667.5, subd. (b)).

At trial, the jury found Peralez guilty on all six counts and found the attendant gang, firearm, and presence allegations true. After the verdict, upon the prosecutor's motion the trial court struck and dismissed the two prison prior allegations. The trial court then found true the prior serious felony conviction allegation and the prior strike conviction allegation.

On July 25, 2018, the trial court sentenced Peralez on count 1 to an indeterminate prison term of 30 years to life plus a consecutive five-year enhancement under section 667, subdivision (a), and, on counts 2 through 6, to a consecutive determinate term of 29 years and eight months, in aggregate. The determinate term included a five-year enhancement under section 667, subdivision (a).

B. *Trial Evidence*

1. Incidents on October 22

The prosecution presented evidence of four crimes that occurred on the morning of October 22, within a few miles of each other in San Jose.

Ellen N. left her home on Crocus Drive about 7:00 a.m. When she returned home at 2:00 p.m., she discovered a large stone on her living room floor and a broken window near her kitchen. She called the police and looked through the house. All three bedrooms had been ransacked. Her laptop, several brand-name purses, money, gold, watches, brand-name belts, expensive shoes, an iPhone and iPad, and a game belonging to her daughter were missing.

Kathy W. left her house on Thistle Drive around 9:45 a.m. She checked the doors to make sure they were locked when she left. Her spouse, Wayne W., had left the house before her that morning. When Wayne returned home between 10:30 and 11:30 a.m., he found that a doorway to the house had been damaged and the door left open. The

3

bedrooms and an office in the house had been ransacked. Jewelry, coins, a .22-caliber Ruger target pistol, and its loaded magazine had been taken. Wayne testified the gun ejected expended casings to the right when fired.

At the time of the burglary on Thistle Drive, Wayne had video cameras that recorded the happenings around his house. Police collected the videos, and the videos and still images captured from them were admitted as evidence at trial. The videos and images depict Peralez and an individual later identified as Jacob Salinas at the house. Salinas appears first around 9:50 a.m., followed by Peralez at 10:00 a.m. Salinas is wearing a black t-shirt, blue jeans, and dark-rimmed glasses. Peralez is wearing a dark hooded sweatshirt and long, dark shorts. They leave the house together at 10:13 a.m. The video shows Peralez walking out of the house with a gun in his hand and a blue Honda Accord present on the street.

Catherine S. lived at a home on Carlotta Court. Around 10:30 a.m., someone rang her doorbell. A few minutes later Catherine opened the door but did not see anyone outside. Around the same time, one of Catherine's neighbors heard three loud bangs.[4] The neighbor looked into Catherine's backyard and saw a man standing near the glass patio door. According to the neighbor, the man was Hispanic, about 19 years old, 6 feet tall, and 190 pounds. He had short dark hair and was wearing black rimmed glasses and black clothing. The man bobbed his head up and down and the neighbor heard another person say loudly, " 'Let's go. Let's go.' " The man then climbed over the backyard fence, walked toward a gray or blue Honda Accord, and got in through the rear passenger door. The car sped away very quickly with three people inside. The driver—who had earlier walked toward the front door of Catherine's house—was a Hispanic man with long brown hair, in his late 20s, wearing light colored clothing and a dark hoodie. The person in the front passenger seat was leaning back and the neighbor could not describe

_____

[4] Catherine did not hear any noises or banging outside her house after she heard the doorbell.

4

him at trial, although the neighbor had previously told police that person was a Hispanic male.

Some of Catherine's neighbors stopped her as she left her home around 10:40 a.m. They told her that someone had tried to break into her house. They pointed toward a car that was driving away. Catherine called the police. Catherine and police observed some scuff marks and scratches on the glass patio door. In addition, loose bricks were lying on the ground nearby.

Around 11:20 a.m., Albert S. arrived at his house on Greenpark Way and noticed someone exiting through a front gate. Albert approached the man and said the house was his. The man said he was there to visit a friend and wanted to go get him. The man turned around and went inside the house. The man was Hispanic, about 20 years old, 5 feet 8 inches tall, and slim. He had slicked back hair and wore a necklace, baggy black t-shirt, jeans, glasses, and possibly gloves.[5]

Albert followed the man toward the house and saw through the front door that his family's belongings were scattered "everywhere." Albert ran inside the entryway and grabbed the man from behind. Albert screamed out for his mother thinking she might be home.[6] A second man, whom Albert identified at trial as Peralez, came running out of a hallway with his hand pointed up, telling Albert to " 'back the fuck up.' " Peralez was about 10 feet away when Albert first saw him, and he "came right up to" Albert. Albert stared at Peralez's eyes and hand; he "was just locked in with the eyes." Albert described the second man in his trial testimony as about 5 feet 9 or 10 inches tall, over 200 pounds,

---

[5] While at the hospital later on the day of the crime, Albert described this man to police as Hispanic, in his twenties, 5 feet 8 inches tall, 160 pounds, with black combed-back hair and wearing either silver or white colored oval-framed prescription glasses, a black t-shirt, and blue pants. In addition, Albert said he could recognize this man if he saw him again.

[6] Albert's mother had left the house that morning around 10:30 a.m. The doors were locked when she left.

5

and Hispanic. He wore a black t-shirt and a baseball cap turned backwards and had long hair that was tied back.[7]

As Peralez approached him, Albert backed up, shoved the first man into Peralez, and yelled at them to get out of the house. Peralez ran out. The first man punched Albert in the face and Albert kicked him four or five times. The altercation lasted "maybe 30 seconds." The first man ran off limping. Albert ran after him and noticed a light blue Honda Accord in the middle of the street. Albert saw the first man crawling toward the car and Peralez standing by the front passenger seat, partially in the car with the door open. A third man wearing a white shirt was in the driver's seat.

Albert ran to the front of the car and then toward the back to check the license plate. As Albert was about to call 911, the first man—who was then in front of the car—yelled to Peralez to " '[s]hoot him.' " Albert looked up and saw Peralez about six feet away with his hand out. Peralez was holding something metallic that looked square with a round hole in it; Albert believed it was a gun.[8] Albert heard a bang, saw smoke around Peralez's hand, and felt pain in his right shoulder. The car drove off. Albert called 911 and went back inside the house.

The police received a report of shots fired about 11:40 a.m., and officers arrived at Albert's house a few minutes later. Albert came out covered in blood. Emergency medical technicians transported Albert to the hospital, where he was treated for a small gunshot wound through his shoulder and released after about four hours.

---

[7] While at the hospital later on the day of the crime, Albert described the second man to police as Hispanic, in his twenties, 5 feet 11 inches tall, 200 pounds, and wearing a black t-shirt and blue pants. In addition, Albert said he could not remember the second man's face " 'too well' " and thought " 'maybe' " he could recognize the man but it was " '50-50.' " Albert also said he did not see any facial tattoos. Peralez, however, had tattoos on his face, including the number 14 and a Huelga bird adjacent to and below his eyes.

[8] In earlier statements to police, Albert said he saw both perpetrators near their getaway car but did not know who yelled " '[s]hoot him.' " Albert also previously told police he did not see a gun or who shot him.

Police searched the crime scene on Greenpark Way but did not find any expended cartridge casings, and no gun was recovered during the investigation.[9] Albert's kitchen window had been shattered by a brick, a large safe had been tipped over and moved, and five bedrooms were in disarray. A second safe had been pried open and a designer wallet that had been stored in it was missing.

### 2. Arrest of Peralez

Around 3:55 p.m. that afternoon, a police officer attempted to stop Peralez in Salinas, California. Peralez was driving alone in a green car. He fled from the officer and led police on a pursuit over several miles. He drove at high speeds, weaved in and out of traffic, ran red lights, and ultimately crashed into some parked cars. Peralez ran from his wrecked car but was stopped by a police canine and taken into custody. He was wearing a black t-shirt.

During the pursuit, Peralez threw from his car what police officers believed was a cellphone. An officer searched the area and found a cellphone. Police downloaded data from the phone. The cellphone contained a photo of a firearm being held by a hand. The tattooed wrist in the photo resembled Peralez's. According to the cellphone data associated with the photo, the photo had been taken at 1:19 p.m. on October 22 (the day of the crimes), along Highway 101 between Gilroy and Salinas. Wayne W. identified the gun in the photo as looking like the one taken from his house. In addition, the cellphone's contacts included Peralez's confederate Jacob Salinas.

When police searched the inside of Peralez's car they found an iPhone and receipts that had been taken from Ellen N.'s home earlier that day.

---

[9] A police officer explained the gun used to shoot Albert might have been a revolver (i.e., a type of gun that does not eject expended cartridge casings when fired) or a semi-automatic weapon that ejected the expended cartridge casing into the getaway car.

### 3. Identification of Peralez by Albert S.

Five days later, on October 27, San Jose Police Officer George Constantin distributed to the press still images and a portion of the surveillance video from the Thistle Drive burglary.  Thereafter, an unidentified police officer called Albert S. and asked if he had seen the surveillance video from a neighbor's house and whether the people in the video were the ones who robbed his house.  Albert looked for the video on the Internet and viewed it.  He immediately recognized the people in the video as " '[a]bsolutely' " the men he had encountered on October 22.

Nine days later, on November 5, police showed Albert two six-person photo lineups.  The police officer who showed Albert the lineups told him to "just relax," there was " '[n]o pressure,' " and the perpetrators might or might not be depicted in the photographs.

From one lineup, Albert picked out Peralez as the man who shot him.  When viewing this lineup Albert said, " 'My heart races on this one.  His eyes look the same.  This is the guy at my house.  The guy who shot me.  He was [the] last guy I looked at before I heard the pop.' "  Albert also told the officer who showed him the lineup that he did not see a gun and " 'assumed' " Peralez was the shooter because Peralez was the last person he saw before he heard the "pop."

From the other lineup, Albert selected Salinas as the first man he encountered on October 22 (i.e., the person who " 'came out of [Albert's] house' " and with whom Albert " 'fought' ").

### 4. Gang Evidence

Detective Jesse Pinon, a gang intelligence deputy with the Monterey County Sheriff's Office, was qualified as a street gang expert with particular expertise in the Salinas East Market gang (SEM).[10]

SEM is a "subset" of the Norteño gang. SEM formed in the mid-1970's in Salinas as a branch of the Nuestra Familia prison gang. SEM members were street soldiers who committed crimes, obtained money for the gang, and funneled the money to the Nuestra Familia. Because SEM is a Norteño gang, their chief rivals are any Sureño gangs. Sureños also derive from a prison gang, the Mexican Mafia, which is the rival of the Nuestra Familia. There are several Norteño subsets in Salinas that also are affiliated loosely with Nuestra Familia.

To become a member of SEM, a person must either be "jumped-in" (i.e., endure an attack by gang members) or "crime-in" (i.e., commit criminal acts at the behest or for the benefit of the gang, which is also known as " 'putting in work' "). Older members of the gang recruit new members from the areas in which they live. Gang members promote the gang and their reputations through their clothing, tattoos, money, violence, drug dealing, theft, and other illicit activity.

SEM members, like other Norteños, identify with and use the number 14, the letter N, the color red, tattoos, and certain sports team logos as gang identifiers. SEM members, in particular, also use as signs and symbols of the gang the letters M and SEM, the number 500 (reflecting the origins of the gang on the 500 block of East Market Street in Salinas), sports logos that include the letter M (i.e., the logos of the Milwaukee Brewers and Minnesota Twins), the words " 'East Side,' " and the Huelga bird. In

---

[10] Although the prosecution presented much of its gang evidence through Detective Pinon, other witnesses also provided evidence about SEM and its members, including Peralez.

addition, SEM members display hand signs that represent the numbers four and 14 and the letters M and E.

Gang members obtain tattoos of their gang's signs and symbols to show their enduring loyalty to the gang, promote it for recruitment purposes, and intimidate other people. Peralez had many SEM and Norteño gang-related tattoos all over his body, including on his face, arms, and hands. If a person had a SEM-related tattoo but was not actually a member of SEM, he would be assaulted by SEM members.

Loyalty is extremely important to gangs. Gang members are expected to back each other up when committing crimes together or upon attack by a rival, to keep secrets, and not to snitch. Any disloyal SEM member is subject to discipline, including by violent attack or death. If a SEM member were to commit a crime for his own benefit (rather than for the gang's), his action would create "issues" with regard to the gang that he "would have to answer to."

Violence is important to SEM. Violence is used to show that SEM members will commit crimes, make money for the gang by any means necessary, bolster the gang's reputation, control their own members, retaliate against those who provide evidence against the gang, terrify the community to prevent reports of crime to law enforcement, and intimidate rival gangs. In addition, by "putting in work," gang members bolster their reputations, earn respect within the gang, support the gang, recruit new members, and control the gang's territory. Members also gain respect by educating others about the gang and helping them to get promoted within the gang's ranks.

SEM marks its territory by tagging it with graffiti. The larger the gang's turf, the more crimes the gang can commit and the more revenue it can generate from within its territory. SEM members use violence to keep rival gang members out of their territory, including those who try to sell drugs or commit crimes within SEM's turf. In October 2015 (i.e., when the charged crimes occurred), SEM claimed several streets in Salinas as

10

its turf, but its members were located throughout Salinas and Monterey County and traveled to San Jose to party.

In October 2015, SEM had at least 50 members (including several high-ranking members), and it was likely that not all SEM members knew each other. The gang had a hierarchical, formal, and written structure that fell under the Nuestra Familia. Members are given copies of the gang's constitution, which sets out its rules and goals, and they are taught about the gang's structure and the responsibilities of membership.

Detective Pinon opined that the primary activities of SEM include robbery, drug dealing, murder, attempted murder, assault with a deadly weapon, illegal possession of firearms, and residential burglary. Detective Pinon based his opinion on his personal experience investigating gang-related offenses, information he had received directly from knowledgeable people, and the law enforcement briefings and classes he had attended.

Through Detective Pinon and other witnesses, the prosecution presented evidence of four predicate offenses to establish a pattern of criminal gang activity by SEM. In particular: (1) Peralez was convicted of possession of a firearm with a gang enhancement, committed on June 22, 2010; (2) SEM member Jesse Diaz was convicted of murder and attempted murder with a gang enhancement, and SEM member Ricardo Villanueva was convicted of attempted murder with a gang enhancement, committed on October 1, 2010; (3) two SEM members, Juan Boyzo and William Martinez, were convicted of robbery with a gang enhancement, committed on July 20, 2013; and (4) two SEM members, Miguel Martinez and Sean Coffer, were convicted of armed robbery and misdemeanor gang participation, committed on April 4, 2014.

Detective Pinon opined that Peralez is a Norteño gang member and specifically a member of the SEM subset. Pinon based his opinion on the current charges, prior investigations of Peralez, prior statements Peralez had made to him, law enforcement documentation of Peralez's gang contacts, Peralez's many SEM-related tattoos, and

11

photographs of Peralez displaying a SEM hand sign and wearing a red hooded sweatshirt and a red and black hat in the company of other people displaying SEM hand signs.

Detective Pinon opined that in October 2015, Jacob Salinas was a "Salinas gang member associate, SEM associate." An associate is someone who "is trying to be part of the gang, working to get that approval into the gang" or "crime-in." Associates hang around with the gang on a constant basis and are "pretty much one step below a gang member." Pinon based his opinion on photos of Salinas on social media, a probation officer's testimony that Salinas affiliated with the northern gang and had gang-related probation conditions, and the current charges. On social media, Salinas presented a SEM hand sign, claimed the color red and Salinas's 831 area code, and displayed a graphic that included the word "Norte" (which is short for Norteño), a red bandana pattern over the outline of a map of California, and "XIV" over a Huelga bird. In addition, Salinas lived in SEM territory.

The prosecutor posed three hypotheticals to Detective Pinon based on the facts of the charged crimes. The hypotheticals focused on three perpetrators—one SEM member, one SEM associate, and an unknown person—committing residential burglaries, shooting a homeowner who interrupted a burglary, and committing the crimes in a county not the one in which the perpetrators live. The prosecutor asked Pinon whether the crimes were committed for the benefit of or in association with a criminal street gang and with specific intent to further, promote, and assist in the criminal conduct of gang members. Pinon said they were.

Peralez did not present any evidence at trial.

## II. DISCUSSION

Peralez asserts four claims of error. He contends that the photo lineup conducted after Albert viewed the surveillance video was unnecessarily suggestive and rendered his later identifications of Peralez unreliable. He claims the evidence was insufficient to support the jury's findings on the gang sentence enhancements. He asserts the portion of

12

CALCRIM No. 315 that allowed the jurors to consider an eyewitness's level of certainty is flawed. Finally, he contends the case should be remanded so the trial court can exercise its sentencing discretion on the prior serious felony enhancements under Senate Bill No. 1393. (Stats. 2018, ch. 1013, §§ 1, 2.) We address Peralez's claims in turn. We also note errors within the abstracts of judgment not raised by either party.

A. *Eyewitness Identification Evidence*

Midtrial, Peralez moved the trial court to strike Albert's testimony about the lineup and in-court identification of Peralez, claiming the identifications were the product of an unduly suggestive identification procedure. Peralez asserted that the defense did not know prior to Albert's testimony that he had watched the Thistle Drive surveillance video at the suggestion of the police before viewing the lineup. Peralez argued that Albert's exposure to the video rendered the lineup unduly suggestive and the identifications of Peralez unreliable.

In denying Peralez's motion, although the officers who testified at trial denied they had spoken with Albert about the surveillance video, the trial court assumed police suggested that Albert watch the video. Nevertheless, the court found the video not unduly suggestive. The court also concluded that Peralez's involvement in the charged offenses was sufficiently corroborated and Albert's description of the crime and identification of Peralez were based on Albert's independent recollection, not his review of the video.

On appeal, Peralez maintains that his constitutional right to due process was violated by the admission of identification evidence that was unreliable and resulted from an unnecessarily suggestive photo lineup administered after Albert viewed the surveillance video.

1. <u>Legal Principles</u>

Due process protections serve as a "check on the admission of eyewitness identification . . . when the police have arranged suggestive circumstances leading the

13

witness to identify a particular person as the perpetrator of a crime." (*Perry v. New Hampshire* (2012) 565 U.S. 228, 232.) " ' "In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) 'whether the identification procedure was unduly suggestive and unnecessary,' and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942 (*Gonzalez*).) When making this determination, the court takes "into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*) [citing, among other cases, *Manson v. Brathwaite* (1977) 432 U.S. 98, 104–107, 114 (*Manson*) and *Neil v. Biggers* (1972) 409 U.S. 188, 199–200 (*Neil*)].)

The defendant bears the burden of demonstrating the existence of an unduly suggestive and unreliable identification procedure. (*People v. Avila* (2009) 46 Cal.4th 680, 700; *Gonzalez*, *supra*, 38 Cal.4th at p. 942.) "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." (*People v. Yeoman* (2003) 31 Cal.4th 93, 125.) "[T]here must be a 'substantial likelihood of irreparable misidentification' under the ' " 'totality of the circumstances' " ' to warrant reversal of a conviction on this ground." (*Cunningham*, *supra*, 25 Cal.4th at p. 990; see also *People v. Ratliff* (1986) 41 Cal.3d 675, 689 ["While a defendant may attack any lineup, photographic or otherwise, as unduly suggestive [citation], the taint of an unlawful confrontation or lineup may be dispelled if the People show by clear and convincing evidence that the identification of the defendant had an independent origin."]; *People v. Yokely* (2010) 183 Cal.App.4th 1264, 1272.)

Appellate courts review deferentially the trial court's findings of historical fact and independently the trial court's ruling on whether, under those facts, a pretrial identification procedure was unduly suggestive and the identification itself was unreliable. (*Gonzalez*, *supra*, 38 Cal.4th at p. 943; *People v. Kennedy* (2005) 36 Cal.4th 595, 609 (*Kennedy*), disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Chavez* (2018) 22 Cal.App.5th 663, 675.) A reviewing court need not decide whether the identification procedure was unduly suggestive if the pretrial identification was " 'nevertheless reliable under the totality of the circumstances.' " (See *People v. Clark* (2016) 63 Cal.4th 522, 556 (*Clark*).)

2. Analysis

Peralez argues that Albert's identification of him was the "product of suggestion" created by Albert's review of the surveillance video on the recommendation of police. He asserts further that the facts and circumstances of the crime and Albert's identification support the conclusion that the identification was unreliable. Peralez notes that, on the day of the crime, Albert told police his ability to identify the second man he encountered during the incident was a " '50/50' " proposition. Peralez maintains that Albert provided only a "very generic description" of the second man to police, did not mention any facial tattoos, and told the 911 dispatcher that the shooter was " 'slim.' " Peralez claims further that Albert's observation of the second man was brief and occurred under extreme stress while Albert was focused on other things. Peralez argues that Albert's certainty and asserted recognition of Peralez based on his eyes are of limited import because Albert reviewed the surveillance video. Peralez finally claims the admission of Albert's unreliable identification was not harmless beyond a reasonable doubt, as required by *Chapman v. California* (1967) 386 U.S. 18, 23–24 (*Chapman*).

For the reasons explained below, we are not persuaded that a due process violation occurred here. Upon review of the surveillance video and other relevant trial exhibits, and based on the totality of the circumstances (see *Neil*, *supra*, 409 U.S. at pp. 199–200;

15

*Cunningham*, *supra*, 25 Cal.4th at p. 989), we conclude that Albert's identifications of Peralez at the lineup and in court were reliable. Accordingly, we need not address Peralez's separate contention that the identification procedure employed in this case was unduly suggestive. (See *Clark*, *supra*, 63 Cal.4th at p. 557.)

Although Albert's interaction with the second perpetrator during the crime was relatively brief, Albert had ample opportunity to observe him. Albert stared at the man's eyes and hand as the man approached from 10 feet away. The man came up close to Albert in the entryway of the house. A short time later, Albert saw the man again on the street near the getaway car. Within a few hours of this interaction, Albert described the second perpetrator to police. That description was consistent with Peralez's ethnicity, age, build, and clothing.[11] Although Albert's description did not include Peralez's facial tattoos, we are not convinced that his otherwise accurate description of Peralez should be discounted. The description is not overly generic. (See *Neil*, *supra*, 409 U.S. at p. 200 [characterizing as "more than ordinarily thorough" a victim's description that "included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice"]; *Manson*, *supra*, 432 U.S. at p. 115 [relying on a description that included race, height, build, hair color and style, a facial feature, and clothing].)

Further, Peralez appears to overstate the record when he asserts that Albert initially (and inconsistently) "identified the 'slim' person, not the heftier Peralez, as the shooter to the 911 dispatcher" on October 22. Based on our review of the 911 transcript, it is, at most, unclear which perpetrator Albert described when he responded to the dispatcher's question, "What did *he* look like, what race was *he*?" (Italics added.) Shortly before this question was asked, Albert had mentioned both perpetrators to the dispatcher and said, "They took off, they got in a car, I ran out there, and he told his

_____

[11] Peralez was twenty-four years old at the time of the crime. He was wearing a black t-shirt when apprehended in Salinas a few hours after the crime. In addition, according to the trial court, Peralez is "not a small person. He's a big person."

16

buddy to shoot me, and he shot me." In response to the subsequent, above-quoted question, Albert said "He was a Mexican guy, slim, (inaudible)." Albert also said the man as wearing a "black shirt" and jeans, in his "early 20s," and of "medium" height.[12]

The description Albert gave to the 911 dispatcher is consistent with the description he subsequently gave at the hospital of the first man he encountered that day (i.e., the person with whom he fought in the house), who Albert said weighed about 40 pounds less than the second man. Moreover, at trial, defense counsel argued to the jury that there was no indication on the 911 tape that Albert could identify the shooter. For these reasons, we are not convinced by Peralez's argument that Albert, inconsistently with Peralez's actual appearance, initially identified the person who shot him as the " 'slim' person."

In addition, we are not persuaded that the surveillance video substantially influenced Albert's identification of Peralez. At the lineup two weeks after the crime, Albert said Peralez's "eyes look the same" as those of the second perpetrator. This explanation for Albert's selection of Peralez bears no relationship to Albert's review of the surveillance video because Peralez's eyes are not clearly visible in the recording. On the surveillance video, Peralez appears briefly and his face is only depicted with clarity in profile as he exits the house. At no point in the video is Peralez's face shown in a way similar to its appearance in the photo lineup.

In sum, based on our consideration of the totality of the circumstances, we conclude Albert's identifications of Peralez in the photo lineup and in court were reliable and not tainted by Albert's review of the surveillance video. (See *Kennedy*, *supra*, 36 Cal.4th at pp. 609–611.) Because the identifications were reliable, their admission did not violate Peralez's constitutional due process rights and the trial court did not err by failing to strike the lineup or in-court identification evidence.

---

[12] Later in the 911 call, Albert said all the perpetrators were Hispanic men who had black hair.

B. *Sufficiency of the Evidence for the Gang Enhancements*

Peralez claims the evidence is insufficient to support the jury's findings on the gang sentencing enhancements alleged for all counts under section 186.22, subdivisions (b)(1) and (4). More specifically, Peralez asserts there is insufficient evidence that he acted with the specific intent to promote, further, or assist in any criminal conduct by gang members. He also asserts that, even if he did act with the requisite intent, there is insufficient evidence that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.

1. Legal Principles

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318.) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*Albillar*, at p. 60.) Before we can set aside a verdict for insufficiency of the evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support [the jury's finding]." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

" '[A] criminal offense is subject to increased punishment under the [Street Terrorism Enforcement and Prevention] Act only if the crime is "gang related." ' " (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Under section 186.22, subdivisions (b)(1) and (4), the prosecution must prove that the underlying felony offense was "committed for the

18

benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Thus, there are two requirements (or prongs) for enhanced punishment under these subdivisions. The underlying offense must have been committed: (1) for the benefit of, at the direction of, or in association with any criminal street gang (the gang-related prong); and (2) with the specific intent to promote, further, or assist in any criminal conduct by gang members (the specific intent prong).[13] (§ 186.22, subds. (b)(1) & (4); see *Albillar*, at pp. 51, 59, 64–65; *People v. Rios* (2013) 222 Cal.App.4th 542, 564 (*Rios*).)

" '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657; see also *Albillar*, *supra*, 51 Cal.4th at p. 60.) Moreover, "[r]arely is the perpetrator's intent proven by direct evidence; usually it must be inferred from the facts and circumstances surrounding the case." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607 [citing *Rios*, *supra*, 222 Cal.App.4th at pp. 567–568].) "To prove the gang enhancement, the prosecution may introduce expert testimony regarding street gangs." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 820; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1048.) The expert's testimony, however, cannot be "purely conclusory and factually unsupported." (See *People v. Ramirez* (2016) 244 Cal.App.4th 800, 819–820; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1008.)

---

[13] Peralez does not challenge the sufficiency of the evidence for the other elements of section 186.22. (See § 186.22, subds. (e) & (f); *People v. Prunty* (2015) 62 Cal.4th 59, 66–67; *People v. Rios* (2013) 222 Cal.App.4th 542, 564, fn. 10.)

2. <u>Analysis</u>

We begin our analysis by addressing the specific intent prong.  Peralez observes that the prosecution's theory apparently rested on the fact that Peralez was a SEM member and his confederate Jacob Salinas was a "SEM associate" when they committed the charged crimes.  He argues that "this theory suffers from a fatal flaw" because Salinas was not an actual SEM gang member at the time of the crimes, only an associate which is " 'one step below a gang member.' "  He argues further there was no evidence the unidentified third perpetrator was a SEM member or that charged offenses related to or assisted other unnamed SEM members to commit other unspecified crimes.  We are not persuaded by Peralez's arguments.

The specific intent prong may be proved by evidence that Peralez committed the underlying offenses with a known gang member.  (See *Albillar*, *supra*, 51 Cal.4th at pp. 64–66, 68; see also *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *People v. Romero* (2006) 140 Cal.App.4th 15, 20.)  As for who is a "gang member" under section 186.22, subdivisions (b)(1) and (4), " '[m]ember' and 'membership' have been held to be terms of ordinary meaning that require no further definition."  (*People v. McDonald* (2015) 238 Cal.App.4th 16, 35 [citing *People v. Green* (1991) 227 Cal.App.3d 692, 699, disapproved on another ground in *People v. Castenada* (2000) 23 Cal.4th 743, 747–748; see also *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1131 (*Rodriguez*) [interpreting section 186.22, subdivision (a)].)

When interpreting a statute, "our 'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  [Citation.]'  [Citation.] 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' [Citations.]  'If the statutory language is unambiguous, then its plain meaning controls.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.)  The Oxford English Dictionary defines the noun "member" as "[a]ny of the individuals, countries, etc., belonging to or

forming a group, society, committee, or assembly." (Oxford English Dict. Online (2020).)[14] To "belong" means "to be a member or affiliate of a particular group or category; to be a follower or adherent of a person, a subject of a ruler, a member of a family, a native or inhabitant of a place, etc.; (now *esp*.) to be a member of a club." (Oxford English Dict. Online (2020).)[15]

Based on the ordinary meaning of the word member, we conclude that a co-participant in an underlying offense can be a "gang member" for the purposes of section 186.22, subdivisions (b)(1) and (4), if the co-participant affiliates himself or herself with the relevant criminal street gang. Under our interpretation of the statute's plain meaning, there is no requirement that the co-participant have fulfilled any membership conditions the gang may have erected for itself. Requiring proof that a co-participant, for example, has been "jumped in" or deemed by the gang to have "crimed in," in the absence of an ambiguity in the statute or some absurd unintended consequence, would constitute an improper judicial revision of section 186.22, subdivisions (b)(1) and (4). (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1131; *People v. Goodliffe* (2009) 177 Cal.App.4th 723, 726; *People v. Garcia* (2018) 22 Cal.App.5th 1061, 1066.)

The evidence presented at Peralez's trial satisfies this specific intent prong. Here, there is substantial evidence that Salinas participated in the underlying crimes with Peralez and that they knew each other, based on the contents of the cellphone Peralez discarded when fleeing from police. In addition, the evidence demonstrates that Salinas affiliated with the northern gang and SEM. He appeared on social media presenting a SEM hand sign, claiming the color red, and displaying a graphic that included Norteño gang signs and symbols. Further, Detective Pinon described how gang associates

---

[14] <https://www.oed.com/view/Entry/116296?rskey=jyN0B7&result=1#eid> [as of November 3, 2020], archived at: <https://perma.cc/KXJ2-6U5L>.
[15] <https://www.oed.com/view/Entry/17506?rskey=QyLMzm&result=2&isAdvanced=false#eid> [as of November 3, 2020], archived at: <https://perma.cc/P68K-KGTV>.

fraternize with SEM members, work to gain their approval, and commit crime at the behest or for the benefit of the gang. For these reasons, we conclude the evidence was sufficient for a reasonable jury to find that Peralez—when he committed the charged crimes with Salinas (a person who affiliated with SEM)—had the specific intent to promote, further, or assist in any criminal conduct by gang members, as required by the statute.

In addition, even if we were to assume arguendo that promoting, furthering, or assisting criminal conduct by a "SEM associate" during the underlying offenses is not sufficient to satisfy the specific intent prong, the prong can be proved in other ways. The specific intent requirement "applies to *any* criminal conduct" by gang members, whether it is the current underlying offense or other criminal conduct. (*Albillar*, *supra*, 51 Cal.4th at pp. 65–66; see also *Rios*, *supra*, 222 Cal.App.4th at pp. 564, 574 ["hold[ing] that the section 186.22, [subdivision] (b)(1) gang enhancement may be applied to a lone actor"]; *People v. Hill* (2006) 142 Cal.App.4th 770, 774.)

Based on the evidence here, the jurors could have reasonably concluded that Peralez specifically intended to promote, further, or assist other future criminal conduct by gang members when he committed the underlying crimes in concert with Salinas. Detective Pinon testified about the many reasons SEM members commit crime. He explained that members commit crime to, among other things, bolster their reputations, support the gang, and recruit new members. Members also educate others (including recruits) about the gang and help them get promoted within the gang. In addition, as mentioned above, gang associates commit crime upon direction and for the benefit of the gang. It is reasonable for the jurors to have deduced from Pinon's testimony that Peralez evaluated, trained, and mentored associates like Salinas by committing crime with them, and that Peralez acted with the intent to promote Salinas forward toward full membership in the criminal enterprise and enhance his ability to assist SEM members in future criminal conduct. Accordingly, even assuming that Salinas was not a "gang member"

22

under the statute when Peralez committed the charged offenses with him, there is substantial evidence from which a reasonable trier of fact could find that Peralez harbored the specific intent to promote, further, or assist other criminal conduct by gang members when he committed the offenses.

Turning to the gang-related prong of section 186.22, subdivisions (b)(1) and (4), Peralez maintains there was no evidence "anyone other than [himself] was a gang member." He also asserts there is no evidence that he discussed the crimes with other gang members or gave any of the proceeds to the gang, or he and the other perpetrators "did anything to identify they were gang members, or that a gang was involved." He also notes that the offenses "did not occur on the [SEM] gang's turf, or that of a rival gang, and none of the victims had any gang ties." He asserts, in sum, that the evidence does not support Pinon's opinion that the offenses were committed for the benefit of, at the direction of, or in association with SEM.

We reject Peralez's claim that the evidence was insufficient to prove the offenses were committed in association with or for the benefit of SEM. A crime is committed in association with a gang if the "defendants relied on their common gang membership and the apparatus of the gang in committing" it. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) "A trier of fact can rationally infer a crime was committed 'in association' with a criminal street gang within the meaning of section 186.22, subdivision (b) if the defendant committed the offense in concert with gang members." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1021.) As discussed above, the evidence establishes that Salinas was known to affiliate with SEM—and thus there was sufficient evidence from which the jury could conclude he was a gang "member" within the meaning of section 186.22, subdivisions (b)(1) and (4)—when he and Peralez committed the charged crimes. The evidence also shows that they aided and abetted each other during the crimes, including when Peralez shot Albert S. upon Salinas's request. In addition, Pinon explained why SEM members and associates commit crime and why they do so together. From this

23

evidence, the jurors could have reasonably inferred that Peralez and Salinas relied on each other and their mutual gang affiliation when committing the charged crimes. For these reasons, we conclude there is substantial evidence that Peralez acted with Salinas to commit the underlying offenses in association with their gang.

Further, although there was no evidence that the proceeds of the crimes were, in fact, earmarked for or delivered to the gang, the jurors could have reasonably deduced that Peralez intended to benefit SEM by bolstering his and the gang's reputation for committing criminal and violent acts. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1)." (*Albillar*, *supra*, 51 Cal.4th at p. 63; see also *People v. Hunt* (2011) 196 Cal.App.4th 811, 821.)

We note that the crimes committed by Peralez and Salinas on October 22 were, according to the expert's testimony, among the primary activities of SEM and if a SEM member were to commit residential burglaries for his own benefit, he would risk punishment from the gang. These facts support a reasonable conclusion that Peralez's crimes were the type of crime committed for the benefit of his gang. Further, Peralez had multiple gang-related tattoos on his face and arms at the time of the crimes. The evidence also included a photograph taken shortly after the crimes showing Peralez holding a gun that had been stolen from the Thistle Drive house and likely had been used to shoot Albert. From this photo the jurors could have reasonably concluded, in accord with Pinon's testimony about gang member proclivities, that Peralez sought to boost his own and SEM's reputation as successful felons and document his and the gang's penchant for violence. Moreover, for the reasons discussed above, the jurors could have inferred that Peralez acted to benefit SEM by committing the crimes with Salinas, so that Salinas could be promoted to full member and to increase Salinas's utility to SEM. For these reasons, we conclude there is substantial evidence that Peralez committed the

24

underlying offenses for the benefit of SEM, and the cases Peralez cites in support of his claim are materially distinguishable based on the facts of his case.

In sum, there is sufficient evidence proving that the underlying felony offenses were committed by Peralez for the benefit of or in association with SEM, with the specific intent to promote, further, or assist in any criminal conduct by SEM members. While the jury might have rejected the prosecution's evidence, our sole task on appeal is to determine whether there was sufficient evidence, drawing all reasonable inferences in favor of the jury's verdict, to support its findings.  We conclude that there was.

C.  *CALCRIM No. 315 and the Eyewitness's Level of Certainty*

Peralez contends his due process rights were violated when the trial court instructed the jury with CALCRIM No. 315, because that instruction told the jurors to consider an eyewitness's level of certainty when evaluating the identification testimony. The instruction specifically recommended the jurors consider the following, which we refer to as the "certainty factor":  "How certain was the witness when he or she made an identification?"

Peralez argues that the certainty of an eyewitness does not correlate with the accuracy of his or her identification.  He maintains that instructing on eyewitness certainty reduced the prosecution's burden of proof and negatively impacted his ability to present a defense to the eyewitness's identification of him.  He further asserts that his defense counsel's failure to object to or seek modification of the certainty factor did not forfeit his current claim because the trial court chose to instruct on eyewitness identification and, thus, was required to instruct in a legally correct manner.  He also contends his claim should be reviewed on the merits because the erroneous instruction affected his substantial rights under section 1259.[16]  Peralez finally argues that inclusion

---

[16] Peralez also argues, in the alternative, that his defense counsel performed deficiently by failing to object to the certainty factor and he was prejudiced by defense counsel's deficient performance.

25

of the certainty factor in the jury instructions either amounts to structural error or was prejudicial under *Chapman*, *supra*, 386 U.S. at p. 24 (for federal constitutional error) and *People v. Watson* (1956) 46 Cal.2d 818, 836 (for state law error (*Watson*)).

The Attorney General counters that Peralez's failure to object to the certainty factor forfeited his current claim of error because the instruction did not constitute an incorrect statement of law or affect Peralez's substantial rights. In addition, the Attorney General contends that any error in instructing on the certainty factor was harmless under *Chapman* and *Watson*.

### 1. Background

Pretrial, the prosecutor proposed several jury instructions but did not request CALCRIM No. 315. Near the close of evidence, the trial court and parties discussed the final jury instructions off the record. Thereafter, the trial court recounted it had "suggested one or two other instructions, and we may have included them or not after [it] spoke with counsel." Although the record does not indicate who proposed using CALCRIM No. 315, the instruction was given upon agreement of the parties.

The tailored version of CALCRIM No. 315 provided to the jury read: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] • Did the witness know or have contact with the defendant before the event? [¶] • How well could the witness see the perpetrator? [¶] • What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] • How closely was the witness paying attention? [¶] • Was the witness under stress when he or she made the observation? [¶] • Did the witness give a description and how does that description compare to the defendant? [¶] • How much time passed between the event and the time when the witness identified the defendant? [¶] • Was the witness asked to pick the perpetrator out of a group?

26

[¶] • Did the witness ever fail to identify the defendant? [¶] • Did the witness ever change his or her mind about the identification? [¶] • How certain was the witness when he or she made an identification? [¶] • Are the witness and the defendant of different races? [¶] • Was the witness able to identify other participants in the crime? [¶] • Was the witness able to identify the defendant in a photographic or physical lineup? [¶] • *Was the witness affected by viewing the surveillance video?* [¶] • Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." (Italics added to indicate an addition to the pattern instruction.)

2. Analysis

We review de novo whether an instruction correctly states the law.[17] (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Moreover, we presume that jurors are "able to understand and correlate instructions" and "have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

The California Supreme Court presently has before it the issue Peralez raises here. (*People v. Lemcke* (June 21, 2018, G054241) [nonpub. opn.] [2018 WL 3062234], review granted Oct. 10, 2018, S250108.)[18] Previously, the Supreme Court upheld the validity of CALJIC No. 2.92—the predecessor to CALCRIM No. 315—which includes a similar certainty factor. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461–462 (*Sánchez*) [rejecting a challenge to CALJIC No. 2.92's direction to consider " 'the extent to which the witness is either certain or uncertain of the identification' "]; see also *People v.*

---

[17] Because we address the merits of Peralez's instructional error claim, we need not separately consider the question of forfeiture or Peralez's alternative claim of ineffective assistance of counsel.

[18] The California Supreme Court granted review in *Lemcke* on the following question: "Does instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate a defendant's due process rights?"

*Johnson* (1992) 3 Cal.4th 1183, 1231–1232; *People v. Wright* (1988) 45 Cal.3d 1126, 1141.)

We disagree with Peralez's contention that *Sánchez* is materially distinguishable on its facts and merits from his case. Unless and until the California Supreme Court decides that it is a violation of the due process clause to instruct the jury with a certainty factor, there was no error in the instruction given to Peralez's jury in light of our high court's precedent. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Even assuming arguendo that the trial court erred by including the certainty factor in CALCRIM No. 315, reversal is not warranted in the present case. Peralez argues that inclusion of the certainty factor is structural error. This argument fails because the certainty factor neither improperly lowered the prosecution's burden of proof nor effectively invalidated the jury's findings. (See *People v. Aranda* (2012) 55 Cal.4th 342, 365.) CALCRIM No. 315, in fact, reminded the jurors of the People's beyond-a-reasonable-doubt burden. Moreover, inclusion of the certainty factor in the list of factors for consideration when evaluating identification testimony is unlike the fundamental errors that have been deemed structural heretofore. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071.) Rather, like most instructional errors, the error here is amenable to harmless error analysis. (See *Aranda*, at p. 363.)

As for which harmless error standard should apply to the instructional error, we are not persuaded that the *Chapman* standard applies. Our Supreme Court used the *Watson* standard in *Sánchez*, a case in which defendant asserted that the trial court erred by instructing the jury it could consider the certainty factor in CALJIC No. 2.92. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 462–463; see also *People v. Ward* (2005) 36 Cal.4th 186, 214.) We discern no reason to apply a harmless error standard different than that employed in *Sánchez*. The certainty factor in *Sánchez* is essentially the same as the one in this case. Hence, the same harmless error standard should apply. Moreover, United

28

States Supreme Court precedent permits courts to consider a witness's level of certainty when determining the reliability of an identification for purposes of admissibility under due process principles. (See *Neil*, *supra*, 409 U.S. at pp. 199–200.) Thus, inclusion of the certainty factor in CALCRIM No. 315 for purposes of weighing the evidence does not itself amount to a federal constitutional error. Accordingly, we apply the *Watson* standard here.

No prejudice resulted from inclusion of the certainty factor in this case because there is no reasonable probability the error affected the result of Peralez's trial. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) As in *Sánchez*, the certainty factor was presented in a neutral manner and did not equate the certainty of a witness's identification with its accuracy. (*Sánchez*, *supra*, 63 Cal.4th at p. 462.) The certainty factor also was only one of more than a dozen factors offered for the jury's consideration and it did not advise the jurors what weight to assign to the eyewitness's confidence. Moreover, as noted above, the instruction itself reminded the jurors of the prosecution's burden to prove Peralez's guilt beyond a reasonable doubt.

In addition, the evidence against Peralez supports a conclusion that he was not prejudiced by the challenged instruction. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 462–463.) Leaving aside Albert's identification of Peralez, the evidence linking Peralez to the crimes at Albert's house was strong. Peralez and his confederate Salinas were recorded by surveillance cameras at the scene of a burglary on nearby Thistle Drive slightly more than an hour before the crime at Albert's house. A Honda Accord was depicted in the surveillance video from Thistle Drive and served as the getaway car for the attempted burglary on Carlotta Court and the crime against Albert. In addition, the surveillance video shows Peralez with a gun in his hand as he leaves the house. Later in the day, after Albert was shot, Peralez was photographed holding a .22-caliber Ruger pistol stolen from the house on Thistle Drive. Peralez immediately fled from the police that afternoon when they attempted to conduct a vehicle stop. Peralez also possessed a cellphone and receipts

29

that had been stolen from Ellen N.'s home on Crocus Drive. In light of the similarities between the charged crimes, the temporal and spatial proximity of the crimes, and that Peralez possessed a gun before and after Albert was shot, there is strong evidence proving that Peralez committed the crimes against Albert and was the shooter.

For these reasons, we conclude that it is not reasonably probable that Peralez would have received a more favorable result had the trial court excluded the certainty factor from CALCRIM No. 315. Further, even if we were to apply the *Chapman* standard here, we would find the inclusion of the certainty factor was harmless beyond a reasonable doubt. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 462–463.)

D. *Senate Bill No. 1393 and the Section 667, Subdivision (a) Enhancements*

The trial court found true a prior serious felony conviction allegation under section 667, subdivision (a) (section 667(a)). As part of Peralez's sentence, the trial court imposed the consecutive five-year enhancement under section 667(a) as part of the determinate sentence on counts 2 through 6 and as part of the indeterminate sentence for count 1.

Peralez argues that Senate Bill No. 1393, effective January 1, 2019, gives the trial court discretion to strike the allegation under section 667(a)—an authority the trial court did not possess at the time it sentenced Peralez. He claims, therefore, that his case should be remanded for the trial court to consider whether to exercise its discretion under section 1385 to strike the enhancement. (Stats. 2018, ch. 1013, §§ 1, 2; *People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones*); *People v. Johnson* (2019) 32 Cal.App.5th 26, 68; *People v. Garcia* (2018) 28 Cal.App.5th 961, 972–973.) The Attorney General agrees, as do we.

Senate Bill No. 1393 applies to defendants whose judgments are not yet final as of the amendment's effective date and, thus, applies to Peralez. (*People v. Stamps* (2020) 9 Cal.5th 685, 699.) Nevertheless, "[w]e are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it

originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*Jones*, *supra*, 32 Cal.App.5th at p. 273.) Without a clear indication of the trial court's intent, remand is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

We have reviewed the transcript of Peralez's sentencing hearing. The trial court proceeded with sentencing under the assumption that it lacked discretion to strike the section 667(a) enhancement. The record does not clearly show whether the trial court would have stricken the enhancement if it had the discretion to do so. We therefore remand Peralez's case to the trial court so that it may hold a hearing to consider whether to exercise its independent discretion to strike the prior conviction enhancement. (§ 667(a).) Peralez, his counsel, and counsel for the People have the right to be present at the hearing. (See *People v. Rocha* (2019) 32 Cal.App.5th 352, 360.) We express no opinion as to how the trial court should exercise its discretion.

E. *Errors in the Abstracts of Judgment*

Although not raised by either party on appeal, we note that the abstracts of judgment do not conform to the oral pronouncement of judgment regarding the section 667(a) enhancements. Specifically, on count 1, the trial court imposed an indeterminate prison term of 30 years to life plus a consecutive five-year enhancement under section 667(a). However, the abstract of judgment for the indeterminate sentence does not reflect the section 667(a) enhancement. Instead, the section 667(a) enhancement attendant to count 1 is included in the abstract of judgment for the determinate sentence imposed for counts 2 through 6. The determinate sentence abstract states that the time imposed under section 667(a) is "10" years. However, the trial court imposed only one five-year section 667(a) enhancement for the determinate sentence.

Relatedly, the determinate sentence abstract states in section 8 that the "TOTAL TIME" is "34 [years] 8 [months]." This figure is incorrect because it includes the section 667(a) five-year enhancement imposed as part of the indeterminate sentence on count 1.

31

The total time actually imposed for the determinate sentence on counts 2 through 6 is 29 years and eight months.  In addition, the box in section 7 of the determinate sentence abstract is not checked.  It should be checked because Peralez's sentence includes an "Additional Indeterminate term (see CR-290)," as reflected on the separate indeterminate sentence abstract.

If, on remand, the trial court does not strike the section 667(a) enhancement, it should correct and amend the current abstracts of judgment to reflect the oral pronouncement of judgment.  (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385–386.)  On the other hand, if the trial court strikes the section 667(a) enhancement, it must resentence Peralez and issue amended abstracts of judgment reflecting the new sentence.

### III. DISPOSITION

The judgment is reversed.  The matter is remanded for the limited purpose of permitting the trial court to determine whether to strike the Penal Code section 667, subdivision (a) enhancement under Penal Code section 1385.  If the trial court strikes the enhancement, it shall resentence defendant accordingly and transmit amended abstracts of judgment to the Department of Corrections and Rehabilitation.  If the trial court declines to strike the enhancement, it shall reinstate the original sentence, prepare amended abstracts of judgment to correctly reflect the trial court's original oral pronouncement of judgment, and transmit the amended abstracts of judgment to the Department of Corrections and Rehabilitation.  In all other respects, Peralez's convictions and sentence are affirmed.

_____
                          Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

**H046144**
*People v. Peralez*